UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

AHMAD BECK                          *      CIVIL ACTION
                                    *
VERSUS                              *      NO. 09-6113
                                    *
N. BURL CAIN, WARDEN                *      SECTION "B" (5)

ORDER AND REASONS

Petitioner Ahmad Beck's ("Beck") objections to the June 17, 2011 Report and Recommendation of the United States Magistrate are overruled. (Rec. Doc. No. 21). Further, Beck's writ of *habeas corpus* is **DISMISSED WITH PREJUDICE** without an evidentiary hearing pursuant to 28 U.S.C. § 2254(e)(2),[1] as the court adopts said Report and Recommendation.

## Factual and Procedural History

Beck is currently a state prisoner at the Louisiana State Penitentiary in Angola, Louisiana. Beck was indicted on April 29, 2004 by a grand jury in Orleans Parish for the second degree murder of Shantell Davis ("Davis"). Beck entered a plea of not guilty at his arraignment held May 6, 2004.

On February 27, 2004, NOPD Detective Calvin Brazley ("Brazley") investigated a report of a burned vehicle containing a

---

[1] Under 28 U.S.C. § 2254(e)(2), an evidentiary hearing is held only when the petitioner shows that either the claim relies on a new, retroactive rule of constitutional law that was previously unavailable or a factual basis that could not have been previously discovered by the exercise of due diligence and the facts underlying the claim show by clear and convincing evidence that, but for the constitutional error, no reasonable jury would have convicted the petitioner.

charred body.   Through further investigation, Detective Brazley discovered that the vehicle belonged to Davis and that she and Beck had a child together.   After running Davis' name through the police computer system's victim file, Brazley learned of a prior incident between Davis and Beck.   Because Brazley was unable to locate Beck, he contacted the media to run a news story indicating that the police were interested in questioning Beck about Davis's disappearance.   As a result, on March 2, 2004, Beck arrived at the police station with his family and his attorney present.

Upon arrival, Beck's attorney advised Detective Brazley that Beck was not to answer any questions without counsel present. Shortly thereafter, Detective Brazley placed Beck under arrest on an unrelated municipal attachment.   After Beck's attorney left, Beck stated that he wanted to meet with his parents.   Detective Brazley then transported Beck to his father's place of business in East New Orleans where Beck spoke with his family in private. After returning to the police station Beck advised Detective Brazley that he wanted to make a statement, and later that day, confessed to killing Davis.

In his confession, Beck stated that he and Davis got into an argument that escalated into pushing and shoving.   Beck stated that Davis grabbed him by his testicles, and then Beck choked Davis to death.   Beck stated that he was frightened and did not know what to

do with the body.   Thereafter, Beck purchased some gasoline, put Davis's body in her car, drove the car to the intersection of Benefit and Eads Streets, and set the body and the car on fire with the gasoline.[2]

Prior to trial, Beck's counsel filed a motion to suppress the confession.   After a hearing held August 6, 2004, the Criminal District Court of Orleans Parish denied the motion.   Beck waived his right to a jury trial, and a trial before the judge took place on August 29, 2006.   The case was taken under advisement and at a separate hearing held September 11, 2006, the Court rendered its verdict finding Beck guilty of the lesser charge of manslaughter and sentenced Beck to 40 years at hard labor.

On direct appeal, Beck's counsel raised two assignments of error: (1) the trial court erred in admitting evidence of other crimes or bad acts without requiring the State to give notice; and (2) the trial court imposed an excessive sentence.   On July 12, 2007, Beck filed pro se a supplemental brief in which he asserted three additional assignments of error: (1) his constitutional rights were violated when the confession was used against him at trial and he did not have counsel present during the interrogation; (2) the trial court erred in denying the motion to suppress the

_____
[2] Dr. Richard Tracey, a pathologist employed by the Orleans Parish Coroner's office, determined that the victim most likely died by manual strangulation and that the victim was dead before her body was burned.

3

confession made after he invoked his right to counsel; and (3) he did not knowingly and voluntarily waive his right to counsel when he confessed to the crime.

On August 16, 2007, Beck filed a second *pro se* supplemental appeal brief in which he added an additional assignment claiming police misconduct and coercion.  Specifically, Beck contended that Detective Brazley used the arrest on the municipal attachment as a "ploy" to pursue a confession on the murder charge.

On December 28, 2007, the Louisiana Fourth Circuit Court of Appeal affirmed the conviction and sentence.  The Court found that Beck's claim, regarding the volition of his confession, was without merit.  Specifically, the Court found that the confession was freely given after Beck knowingly and voluntarily waived his rights.  The court did not address Beck's claim regarding police misconduct.

On January 23, 2008, Beck, submitted a writ application to the Louisiana Supreme Court in which he again raised all six of his prior appellate claims:  (1) the trial court erred in admitting evidence of other crimes or bad acts without requiring the State to give notice; (2) the trial court imposed an excessive sentence; (3) his constitutional rights were violated when the confession was used against him at trial and he did not have counsel present during his custodial interrogation; (4) the trial court erred in

4

denying the motion to suppress the confession made after he invoked his right to counsel; (5) he did not knowingly and voluntarily waive his right to counsel when he confessed to the crime; and (6) police misconduct during the arrest where there was no probable cause to arrest him on the unrelated warrant as a ploy to secure a confession to this crime.

On September 19, 2008, the Louisiana Supreme Court denied Beck's writ application without stated reasons. Beck timely filed his petition for writ of habeas corpus with the District Court for the Eastern District of Louisiana on September 1, 2009. The record reflects, and the State concedes, that Beck's petition was timely filed and that his claims have been exhausted and are not in procedural default. On June 17, 2011, Magistrate Judge Roby recommended that Beck's petition for issuance of a writ of habeas corpus be disposed of without an evidentiary hearing.

**Law and Analysis**

**I.   Beck's Habeas Petition**

The Antiterrorism and Effective Death Penalty Act ("AEDPA") went into effect April 24, 1996, and is applicable to habeas petitions filed after that date. Beck filed his petition in September 2009, therefore, his case is not governed by the pre-1996

version of the federal habeas statute, but by the statute as amended by AEDPA.

The threshold questions in habeas review are whether the petition is timely and whether the claim raised by the petitioner was adjudicated on the merits in state court. *Nobles v. Johnson*, 127 F.3d 409, 419-20 (5th Cir. 1997) (citing 28 U.S.C. § 2254(b), (c) (2006)).  In this case, Beck's petition was timely filed, his claims have been exhausted, and none are in procedural default. Therefore, a review of the merits of Beck's claims is warranted.

**A.      The Standard of Review**

The AEDPA contains a comprehensive reform of federal habeas corpus legislation, including 28 U.S.C. § 2254. Subsections 2254(d)(1) and (2) sets out the standards for reviewing a state court's denial of a petitioner's federal constitutional claims. If, the state court adjudicated the petitioner's claim on the merits, questions of law and mixed questions of law and fact are reviewed under § 2254(d)(1); whereas, questions of fact are reviewed under § 2254(d)(2). *Hill v. Johnson*, 210 F.3d 481 (5th Cir. 2000), *cert. denied*, 532 U.S. 1039 (2001).

The voluntariness of a confession requires determination of mixed issues of law and fact. See *Miller v. Fenton*, 474 U.S. 104, 112 (1985). However, such determination may also involve underlying

factual determinations and mixed issues of law and fact. *Barnes v. Johnson*, 160 F.3d 218, 222 (5th Cir. 1998) (citing *Muniz v. Johnson*, 132 F.3d 214, 219 (5th Cir.)(1998)).

With respect to the underlying factual issues, a federal court on habeas petition will give the state court's determination of voluntariness the presumption of correctness. 28 U.S.C. § 2254(d)(2) (2003). A petitioner may rebut the presumption of correctness by offering "clear and convincing evidence." 28 U.S.C. § 2254(e)(1) (2003). Specifically, a petitioner must prove that a state court's factual determinations were "based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." *Hill*, 210 F.3d at 485 (quoting 28 U.S.C.A. § 2254(d)(2)).

A state court's determination of questions of law and mixed questions of law and fact are governed under § 2254(d)(1). The standard requires that a federal court give deference to a state court's determination of voluntariness, provided it was not "contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States." *Drinkard v. Johnson*, 97 F.3d 751, 768 (5th cir. 1996), *cert denied*, 520 U.S. 1107 (1997); 28 U.S.C. § 2254(d)(1) (2003).

Notably, 28 U.S.C. § 2254(d)(1)'s "contrary to" and "unreasonable application" clauses have independent meaning. *Bell v. Cone*, 535 U.S. 685, 694 (2002) (citing *Williams v. Taylor*, 529 U.S. 362, 404 (2000)).

> A federal habeas court may issue the writ under the "contrary to" clause if the state court applies a rule different from the governing law set forth in our cases, or if it decides a case differently than we have done on a set of materially indistinguishable facts. The court may grant relief under the "unreasonable application" clause if the state court correctly identifies the governing legal principle from our decisions but unreasonably applies it to the facts of the particular case. The focus of the latter inquiry is on whether the state court's application of clearly established federal law is objectively unreasonable … an unreasonable application is different from an incorrect one. *Id.*

In making the 'unreasonable application' determination a federal court's inquiry must focus on whether the state court's application of law was objectively unreasonable." *Neal v. Puckett*, 286 F.3d 230, 244 (5th Cir. 2002) (citing Williams, 120 S. Ct. at 1521.). Moreover, a state court must provide "a responsible, thoughtful answer reached after a full opportunity to litigate." *Id.*

Section 2254(d)'s standard of review, for an "unreasonable application" of federal law, is applicable to a federal court's decision making process regardless of whether the state court's decision included an explanation. *Harrington v. Richter*, 562 U.S. ____, 131 S.Ct. 770, 777 (2011) (explaining that "[w]here a state

8

court's decision is unaccompanied by an explanation, the habeas petitioner's burden still must be met by showing there was no reasonable basis for the state court to deny relief.").

**B.    Other Crimes or Bad Acts Evidence and Excessive Sentence (Claims 1 and 2)**

Beck expressly agrees with the Magistrate Judge's Report and Recommendation to the extent claims 1 and 2 should be dismissed.   Those Claims involved the admission of other crimes or bad acts evidence and the 40 year sentence for manslaughter.

**C.    Voluntariness of Beck's Confession (Claims 3, 4, 5)**

Beck's third, fourth, and fifth claims for relief center on the voluntariness of his confession.  Specifically, Beck contends that he did not waive his right of counsel and, therefore, his confession was obtained in violation of *Edwards v. Arizona*, 451 U.S. 477 (1981). However, Beck's claims do not merit federal habeas corpus relief.

The Fifth and Fourteenth Amendments' bar against compelled self-incrimination require that a custodial interrogation[3] be preceded by a disclosure to the suspect of his right to remain silent and right to the presence of an attorney. *Edwards*, 451 U.S.

_____
[3] "By custodial interrogation, we mean questioning initiated by law enforcement officers after a person has been taken into custody or otherwise deprived of his freedom of action in any significant way." *Miranda v. Ariz.*, 384 U.S. 436, 444 (1966).

at 481-482 (citing *Miranda v. Ariz.*, 384 U.S. 436, 479 (1966)).  If a suspect requests counsel, the interrogation must cease until an attorney is present; otherwise, the suspect's subsequent statements are excluded by the trial court. *Id.* at 485-86 (citing *Miranda*, 384 U.S. at 474).  If, however, a suspect makes an ambiguous or equivocal reference to an attorney, there is no requirement that a law enforcement officer cease the interrogation, or ask questions to clarify the ambiguous statement of the suspect. *Davis v. United States*, 512 U.S. 452, 459 (1994); *Berghuis v. Thompkins*, 130 S. Ct. 2250 (2010).

Under certain circumstances, a suspect may execute a waiver *after* a suspect has previously invoked his right of counsel. The Supreme Court promulgated the standard for determining the validity of such waiver in *Edwards*, which provides as follows:  (1) that the suspect initiates the further communication, exchanges, or conversations with the police and; (2) that the prosecution proves, by the preponderance of the evidence, that the waiver was executed by the suspect voluntarily, knowingly, and intelligently as determined by the totality of the circumstances, including the background, experience, and conduct of the suspect. *Edwards*, 451 U.S. at 482.  See also *Oregon v. Bradshaw*, 462 U.S. 1039 (1983); *United States v. Cherry*, 733 F.2d 1124 (5th Cir. 1984). Accordingly, a suspect's initiation and waiver are separate issues

10

and must be addressed in turn. *Smith v. Illinois*, 469 U.S. 91, 96 (1984).

With respect to initiation, the critical inquiry is whether the suspect was further interrogated before he reinitiated conversation with law enforcement officials.  See *Willie v. Maggio*, 737 F.2d 1372, 1384 (5th Cir. 1984).  An interrogation cannot be resumed by a law enforcement officer upon a mere showing that a suspect responded to police-initiated custodial interrogation, even if the suspect has been advised of his rights.  *Edwards*, 451 U.S. at 484.

With regard to what statements constitute initiation, routine inquiries "such as a request for a drink of water or a request to use a telephone" will not generally initiate a conversation under the rule adopted in *Edwards*. *Bradshaw*, 462 U.S. at 1045-1046. Whereas, a communication representative of "a desire on the part of an accused to open up a more generalized discussion relating directly or indirectly to the investigation," may constitute suspect initiation under *Edwards*. *Id* (holding that the defendant's question "Well, what is going to happen to me now?" was sufficient to constitute suspect-initiated communication under *Edwards*). After the requirement of suspect-initiation is satisfied, a court's focus must shift to the validity of the waiver.

11

With regard to the voluntariness of a waiver, a suspect must relinquish his right of counsel "in the sense that it was the product of a free and deliberate choice rather than intimidation, coercion, or deception." *Colorado v. Spring*, 479 U.S. 564, 573 (1987).  In order to knowingly and intelligently waive a right of counsel "the waiver must have been made with a full awareness both of the nature of the right being abandoned and the consequences of the decision to abandon it." *Id.*

The policy behind the *Edwards* rule "is to protect against and to discourage police interference with the free exercise of the right to counsel."  The Fifth Circuit has failed to apply the *Edwards* rule outside of the context of badgering police conduct. *Plazinich v. Lynaugh*, 843 F.2d 836, 838-839 (5th Cir. Tex. 1988). Moreover, the Fifth Circuit has held that the *Edwards* rule is to be strictly and narrowly applied "in the absence of some police interference with the exercise of the right to counsel of the accused[.]" *Id.*

In this case, the record clearly reflects that after Beck invoked his right of counsel, Beck initiated further communication with Detective Brazley.  In addressing Beck's claims on direct appeal, the Louisiana Fourth Circuit made the following findings:

> At the hearing on the Motion to Suppress, Det. Brazley related that when Beck arrived at the police

station with his attorney, the attorney told the
detective that the police were not to question Beck
concerning the victim's disappearance. Det. Brazley said
that he adhered to the attorney's instruction. However,
after the attorney left, Beck told the detective that he
wanted to meet with his parents. Det. Brazley transported
Beck to his father's place of business in East New
Orleans where he was allowed to speak with his family in
private. After Beck and Det. Brazley returned to the
police station, Beck advised Det. Brazley that he wanted
to make a statement. The detective reminded the defendant
of his attorney's instructions not to speak to the
police. Nevertheless, Beck continued to insist that he
wanted to make a statement because he "was tired [of the
guilt] and "just [couldn't] take it no more". At that
point, Det. Brazley read Beck his rights and asked him if
he understood and wanted to waive his rights. Beck
responded affirmatively. Pursuant thereto, Beck signed
the Rights of Arrestee form.

After reviewing the transcript of Beck's statement,
there is nothing to indicate that Beck did not knowingly
and intelligently waive his rights. The statement clearly
indicates that Det. Brazley read Beck his rights prior to
the interrogation. Prior to questioning Beck, the
detective advised him that he was under investigation for
the victim's disappearance and reminded him that his
attorney advised him not to make a statement. Further,
the statement shows that Det. Brazley had Beck read aloud
the rights he was waiving as listed on the Rights of
Arrestee form. Det. Brazley then asked Beck whether he
was coerced or threatened into making a statement. Beck
denied any coercion or threats, and stated that he was
making the statement freely and voluntarily. Det. Brazley
specifically asked Beck: "And do you understand that
you're waiving your rights against your counselor's
advice?" Beck answered "yes". The detective continued:
"Which mean [sic], and you still want to make a statement
although your attorney told you not to?" Again, Beck
answered "yes".

The district court did not err in allowing Beck's
confession to be admitted into evidence. A review of the
record supports a finding that the confession was
knowingly, intelligently, and voluntarily made.

13

The record reflects that, upon arrival at the police station Beck's attorney gave Detective Brazley instructions not to question Beck concerning the victim's disappearance.  Detective Brazley followed Beck's attorney's instructions and did not question Beck any further about the matter.  Afterwards, Beck requested to meet with his family and subsequently, Beck was transported to his father's place of business, where he spoke with his family in private.  Thereafter, Beck returned to the police station where he insisted that he wanted to make a statement.

Importantly, during the interim between Beck's arrival with his attorney at the police station and Beck's request to make a statement, the record reflects that Detective Brazley did not further interrogate or communicate with Beck about the victim's disappearance.  Rather, the facts of this case establish that, Beck initiated communication with Detective Brazley.  Moreover, the record indicates that after visiting his family, Beck expressed a desire to open up a discussion with Detective Brazley relating directly to the investigation of the victim's disappearance.  Further, the record is void of any indication that, after initiation, Beck made any subsequent unambiguous or unequivocal requests for counsel.

Additionally, the record clearly indicates that Beck's confession to committing the crime was made voluntarily, knowingly,

and intelligently.  Detective Brazley informed Beck of his rights, in precisely the manner specified by *Miranda*.  Beck was made aware of his *Miranda* rights while his attorney was present at the police station and before Beck chose to make a statement.  At the suppression hearing, Detective Brazley testified that after Beck was read his rights Beck affirmed that he understood his rights and proceeded to sign a written waiver.

In fact, prior to his confession, Beck was told that he was under investigation for the victim's disappearance and reminded in great detail that his attorney advised him not to make a statement about the matter.  Nonetheless, Beck persisted on making his statement.

Thus, the record fully supports the conclusion that Beck consented to give his inculpatory statement out of his own free will and with knowledge of the nature of the right being abandoned and the consequences of the decision to abandon it.  Further, Beck has not offered clear and convincing evidence that the factual determinations of the Louisiana Fourth Circuit were unreasonable. Contrary to Beck's Objection to the Magistrate's Report and Recommendation, his confession cannot be "fruit of the poisonous tree" if the tree itself is not poisonous.  *Colorado v. Spring*, 479 U.S. 564, 571–572 (1987).

In consideration of the totality of the circumstances, this court finds that Beck initiated communication with Detective Brazley and executed a valid waiver of his right of counsel and, therefore, Beck removed the constitutional safeguards afforded to him in *Edwards*.

Beck has failed to demonstrate that his confession was unconstitutionally obtained. He had no basis for the trial court granting his motion to suppress the confession. Further, Beck has not established that the admission of the confession at trial caused a violation of due process.  Based on the aforementioned reasons, the state court's determination that Beck's confession was committed voluntarily, knowingly, and intelligently was not contrary to, or involved an unreasonable application of, *Edwards* and its progeny.

### C.    Police Misconduct to Coerce Confession (Claim 6)

In his final claim, Beck contends that the arrest by Detective Brazley on an outstanding municipal attachment was an orchestrated lie, purposefully designed to obtain a confession to the murder of Shantell Davis, outside the presence of counsel.  Again, the crux of this issue centers on the voluntariness of Beck's confession under *Edwards* and its progeny.

The rule set forth in *Edwards* is "designed to prevent police from badgering a defendant into waiving his previously asserted Miranda rights." *Minnick v. Mississippi*, 498 U.S. 146, 150-151 (1990) (citing *Michigan v. Harvey*, 494 U.S. 344, 350 (1990)).  With respect to police conduct prior to a suspect's initiation, the *Edwards* rule is to be strictly applied in the absence of some police interference with a suspect's exercise of the right of counsel. *Plazinich*, 843 F.2d at 838-39.  While, the *Edwards* rule ensures that any statement made in subsequent interrogation is not the result of coercive pressures, it also sets forth a bright-line rule in which a suspect may waive his right of counsel upon initiating further communication with the interrogating police officer.  *Edwards*, 451 U.S. at 482; Guidry v. Dretke, 397 F.3d 306, 328 (5th Cir. 2005).

The waiver of the right of counsel must be made voluntarily, "in the sense that it was the product of a free and deliberate choice rather than intimidation, coercion, or deception." *Moran v. Burbine*, 475 U.S. 412 (1986).  A suspect's waiver of right to counsel is deemed voluntary absent evidence that a suspect's will was overborne and his competence impaired due to coercive police misconduct. *Colorado v. Spring*, 479 U.S. 564, 574 (1987).

"The determination of whether officers engaged in coercive tactics to elicit a confession is a question of fact, and the state

17

court's factual findings are entitled to deference if supported in the record." *Carter v. Johnson*, 131 F.3d 452, 462 (5th Cir. 1997); *Pemberton v. Collins*, 991 F.2d 1218, 1225 (5th Cir. 1993); *Self v. Collins*, 973 F.2d 1198, 1204 (5th Cir. 1992); see also Miller, 474 U.S. at 112 (noting that subsidiary questions such as whether the police engaged in coercive tactics are afforded the presumption of correctness).   Further, under the habeas corpus statute, federal judges are afforded discretion to respect credibility determinations made by the trier of fact. *Pemberton*, 991 F.2d at 1225 (citing *Sumner v. Mata*, 455 U.S. 591, 597 (1982)); see *Andersen v. Thieret,* 903 F.2d 526, 529-30 (7th Cir.1990) (explaining that a state trial court's conclusion that a confession was voluntary may be reasonably construed as a rejection of the defendant's allegation of police misconduct). While the voluntariness of the statement is a threshold requirement, the court must also consider the execution of Miranda warnings, and the "temporal proximity of the arrest and the confession." *Brown v. Ill.*, 422 U.S. 590, 603-604 (1975).

In this case, Beck alleges that Detective Brazley used his municipal arrest as leverage to obtain Beck's confession, rendering Beck's waiver of counsel involuntary and in violation of *Edwards* and its progeny.   In support of his claim, Beck alleges that Detective Brazley "employed deception and used impermissible

tactics" in informing his attorney upon their arrival at the police station that Beck was under arrest based on an outstanding municipal attachment.

As discussed, *supra*, the record clearly supports the conclusion that Beck initiated further communication with Detective Brazley and executed a waiver of counsel voluntarily and knowingly. Prior to Beck's arrival at the police station Detective Brazley secured a municipal warrant for Beck.   Once Beck voluntarily arrived at the police station, Detective Brazley was able to legally verify the warrant and place Beck under arrest.   At that time, Beck's counsel was present and made aware that Beck would be placed under arrest and wanted for questioning in the victim's disappearance.   Beck offers no evidence contradicting the fact that he was arrested pursuant to a valid outstanding attachment.   The record reflects that Beck was allowed to speak with his attorney before and after his arrest.

While waiting to be transferred to Central Lockup Beck requested to speak with his father.   Then, after notifying Beck's attorney, the officers took Beck to his father's place of business, where Beck had a conversation with his family members.   Thereafter, Beck told Detective Brazley that "he had to get it off his chest, he couldn't live with it anymore."

19

Immediately thereafter, Detective Brazley informed Beck of his Miranda rights and had Beck read those rights from the Rights of Arrestee form.  Detective Brazley specifically asked Beck whether he was coerced or threatened and Beck denied any coercion, affirming the confession was made out of his own volition.  Before the confession, Brazley reminded Beck about his attorney's advice not to make a statement, and Beck stated that he understood he was waiving his rights against the advice of his attorney.  Detective Brazley followed Beck's attorney's instructions and did not further question Beck with regard to the victim's disappearance.  Thus, the record clearly reflects that Beck was not compelled to attend a formal interview and answer to a police-initiated interrogation.  See *Minnick v. Mississippi*, 498 U.S. 146 (U.S. 1990) (holding that the suspect's interrogation was impermissible under *Edwards* because it was initiated by the police in a formal interview which he was compelled to attend, after the suspect had previously made a specific request for counsel).  Rather, it was Beck who initiated further discussion with Detective Brazley.  By doing so, Beck knowingly and voluntarily removed the constitutional safeguard of his right of counsel and confessed to the strangulation of the victim. *Edwards*, 451 U.S. at 484-485.

Further, Beck offers no evidence of any mistreatment by Brazley or any other law enforcement officers.  In Beck's Objection

to the Magistrate's Report and Recommendation, Beck suggests that his emotional state was due to mistreatment by police officers. Contrary to Beck's contention, Beck confirmed in his statement that his emotional state was not the result of being mistreated or threatened. Further, at the suppression hearing, Detective Brazley testified that Beck's emotional state was attributed to his fatigue from guilt.

Beck has also failed to demonstrate that the unrelated arrest led to his eventual confession. This is illustrated by the fact that Beck came to the police station in response to Brazley's contact with the media. Prior to the arrest, Detective Brazley was unable to locate Beck, so he contacted the media to run a news story indicating that the police were interested in questioning Beck about Davis's disappearance. As a result, Beck arrived at the police station with his family and his attorney present. The trial court found that Beck, wrought with guilt, volunteered his confession, not that Beck's confession was predicated by the unrelated arrest.

To conclude, the state court's determination that this claim was meritless was not contrary to or an unreasonable application of *Edwards* and its progeny to the facts of this case. See 28 U.S.C. § 2254(d)(1) (2003). Therefore, this Court must accept the state court's factual determinations as true. Accordingly, the record

21

does not demonstrate that Beck's confession was a product of coercion or police misconduct.

As set forth above, Beck's claims are without merit. Accordingly, **IT IS ORDERED** that the petition for issuance of a writ of habeas corpus filed pursuant to 28 U.S.C. § 2254 be **DENIED** and **DISMISSED WITH PREJUDICE**.

New Orleans, Louisiana, this 1ST day of August, 2011.


UNITED STATES DISTRICT JUDGE